## THADDEUS G. HILL v. UNION ELECTRIC LIGHT & POWER COMPANY, Appellant.

### In Banc, July 2, 1914.*

1. **CONTRACTS: Permits to Use Electric Wire Poles: Construed in Light of Facts.** The permit from the city to an electric light company to replace old poles with new ones along a street, upon condition that "same space be reserved for wire-using companies that are now occupying space on said poles," are to be read and construed in the light of the facts and circumstances that existed at the time the permit was granted; and if prior thereto, employees of one of the other "wire-using companies" were accustomed to go upon said poles to untangle "troubled" wires of their respective companies, it

*Note.*—Decided May 4, 1914; motion for rehearing filed; motion overruled, and opinion on rehearing filed July 2, 1914.

will be held that, after the erection by defendant of new poles, the said employees had the same right to go upon one of said new poles for the purpose of untangling the wires of their companies. Said permit carried with it all reasonable uses necessary to properly conduct their business by the respective companies.

2. **NEGLIGENCE: Insulation of Elecric Wire: Proof: In Manner as Charged.** Where the evidence all shows that the insulation of the wire which caused the injury was worthless as a protection to the linemen whose duties required them to go upon the poles for the purpose of untangling "troubled" ‚wires, and that of defendant went so far as to show that no insulation manufactured would afford sufficient protection, it is wholly immaterial whether an allegation that the insulation had become decayed, worn and disintegrated, was specifically proven or not.

3. **CONTRIBUTORY NEGLIGENCE: Plea Admits Negligence.** A plea of contributory negligence by necessary implication admits negligence on the part of him who makes the plea.

4. ————: **Proper Plea.** *Held*, by WOODSON, J., that, if defendant was not guilty of negligence, but the injury was caused by the sole negligence of the plaintiff, a plea of contributory negligence is improper, but the plea should be either a general denial or that the injury was the result of the plaintiff's own negligence and not that of defendant.

5. **NEGLIGENCE: Hazardous Business: Degree of Care.** A company engaged in a hazardous business is required to exercise the highest degree of care to avoid injuring others, if indeed it is not an insurer against such injuries.

   Observed by BOND, J., that modern industrialism has called into constant use, for the benefit of the public, many complex devices, whose handling is hazardous, and the multitude of injuries resulting therefrom calls loudly for a workingman's compensation law, which will provide a means by which the injured employee may recover for his injuries, whether or not they were the result of defendant's negligence.

6. ————: ————: **Demurrer to Evidence: Live Wire on Handhold.** Three companies (the Bell, Kinloch and Union Light) had used the same city poles for stringing their electric wires, each upon separate cross-arms, the Union Light's cross-arms being between those of the other two companies, and the entire number of wires very large. The employees of the three companies had equal rights to ascend the poles to repair the wires or adjust entanglements. The defendant (the Union Light Company) had obtained permission to remove old poles and

substitute new ones, upon condition that the "same space" was "reserved for wire-using companies," and in pursuance thereto had removed a pole and inserted a new one, but had not installed the cross-arms, but had driven into the pole iron handholds, fourteen or sixteen inches apart. Sometime later there was a wind and rain storm, and the next day, plaintiff, a "trouble" man in the employ of the Kinloch Company, an experienced and skilled man for the business, was directed to investigate and discover the "trouble" with a Kinloch wire. Examining the cable-box he found that a slight current of electricity was passing from some other wire to the one in "trouble," and proceeding along that wire he came to the pole and discovered that the trouble was caused by an entanglement of that wire with one of those of the Bell Company, eight or ten inches from the pole, and 20 or 25 feet from the ground. He climbed up the pole, without rubber gloves, using the handholds for his feet and hands. Before he began to mount he looked among the wires and saw nothing that indicated danger. When he reached the neighborhood of the "troubled" wire, which was on the opposite side of the pole from his body, standing on a handhold with one foot and feeling around the pole with the other and his knee, he reached for the wire with one hand and, to keep his balance, for a handhold with the other, and as this hand closed over the iron handhold it also closed over a live wire lying loose thereon. This wire belonged to defendant, had been permitted to sag and rest on the iron handhold, was defectively insulated and defendant's evidence showed that no insulation would withstand wind and weather, and it is inferable from the evidence, though there is none positive and direct upon the point, that the sagging of the wire was due to defendant's failure to place the cross-arms on the pole and attach the wires thereto. The electric shock rendered plaintiff unconscious, and when found his hands were badly burned. *Held*, that the facts show negligence on defendant's part, and no such contributory negligence on plaintiff's part as would authorize the court to declare as a matter of law that he could not recover.

*Held*, by LAMM, C. J., concurring, with whom WOODSON, BROWN and WALKER, JJ., concur: *first*, that it cannot be held as a matter of law that ordinary care requires a "trouble" lineman *on the ground* to see the contact of a high-voltage wire with an iron foothold at the top of a pole forty feet high; and, *second*, that ordinary care does not, as a matter of law, require such lineman, as he *climbs* a pole, to see the contact of that wire with a handhold on the other side of the pole, since the law does not require a man in climbing to look up and down and around the pole at every instant of time, and hence whether or not

Hill v. Union E. L. & P. Co.

plaintiff exercised ordinary care was a question for the jury.

*Held*, by GRAVES, J., dissenting, with whom FARIS, J., concurs, that plaintiff's own negligence bars his recovery; that being a "trouble" man among wires, his duties required alertness, and he knew the line of poles were occupied by the wires of more than one company, that wires were likely to be misplaced by a wind storm, that the pole had no cross-arms and that the wires had not been attached to the pole that stood in the midst of them, and knowing these things and the steps and wires being in plain view his duty was to look; and if he had looked at each handhold before touching it he would not have been injured.

*Held*, by BOND, J., dissenting, that the judgment for plaintiff, cannot stand, for two reasons: *first*, the negligence charged in the petition is defendant's failure to insulate the wire, and there is no evidence whatever to sustain that allegation; and, *second*, there is no evidence that any right had been given to the Kinloch Company, by which plaintiff was employed, to use the pole before it had been equipped with cross-arms to support the wires, and therefore none that defendant could have foreseen the accident.

7. ———: ———: ———: Sagging of Light Wires: Inference from Accompanying Facts. Common experience teaches that the removal of a pole upon which electric wires have been strung, leaving them unattached to a new pole erected in place of the one removed, will cause them to sag and wave to and fro in a strong wind; and where a defectively insulated wire is found resting on the iron handhold driven into the pole, and no other reason is assigned for its loose and sagging condition, the jury are justified in finding, as a warrantable inference, that the absence of cross-arms on the pole was the cause of the sagging, and that the sagging and a strong wind of the night before were the cause of its resting on the handhold.

8. CONTRIBUTORY NEGLIGENCE: Noninsulated Wires: Rubber Gloves. It does not seem logical or scientific to contend that science has discovered no insulation which will perfectly insulate a wire of high voltage strung in the open air, and thereby render it harmless in handling, and at the same time contend that science has produced a rubber glove which, when worn, will completely protect from danger any one handling the same wires; and, therefore, it does not seem fair or scientific, to hold, as a matter of law, that an electric light company should be excused for permitting an uninsulated wire to sag and remain unattached to a pole and to rest in an iron handhold, and that a lineman, who was required to mount that pole for the purpose of untangling "troubled" wires and in

doing so reached for the handhold in which rested the live wire, should be charged with contributory negligence for not wearing rubber gloves.

9. ————: Electric Wire: Duty to Look: Presumption: Obvious Defect. Where three companies used the same poles for their electric wires, a "trouble" lineman of one of them who, having discovered that a wire of his company was entangled with that of the second, mounted a new pole erected by the third, on which there were handholds but no cross-arms, had a legal right to presume that the third had insulated its wires and had properly guarded them when it removed the old pole and erected the new one; and the fact that a loose live wire of said third company was lying in an iron handhold which he was expected to use, and which was situated on the opposite side of the pole from him, was not a defect or danger so apparent that the law required him, as a reasonably prudent person looking out for his own safety, to see or anticipate. A negligent act of omission is not as grave as a negligent act of commission.

10. ————: ————: ————: Matter of Law. It cannot be held as a matter of law that it is the duty of a "trouble" lineman, mounting a pole to adjust entangled wires, to discover that a live wire of another company which erected the pole for the joint use of both, is lying loose in an iron handhold on the opposite side of the pole, although there is evidence tending to show that he was guilty of contributory negligence in not seeing the defect. His duty is to be determined by the circumstances surrounding him, and if reasonable men would reach different conclusions as to his duty to anticipate and discover the presence in the handhold of, or a defect in, the imperfectly insulated wire, then the question of whether or not he was guilty of such contributory negligence in not seeing the danger as precludes a recovery, is one for the jury. The law imposes on him ordinary care for his own safety, and he is to be held, as a matter of law, guilty of negligence resulting in his injury, only in case he failed to exercise ordinary care to discover the danger.

11. NEGLIGENCE: Allegation of Decayed Insulation of Electric Wires: Proof of Insufficient Insulation. Although the petition alleged that the insulation of the electric wire left lying loose in the iron handhold was old and decayed and on that account was insufficient to confine the current of electricity to the wire, and that by reason thereof the electricity escaped therefrom and injured plaintiff when in climbing the pole he seized the handhold, and although there was no proof that the insulation was old and decayed, yet if all the evidence shows that the insulation was insufficient, and that of the

defendant goes further and tends to show that there was no known insulation by which such wires could be perfectly insulated, it will not be held that there was a failure of proof, because the ultimate fact, namely, the insufficient insulation, was established.

12. ———: **Instruction: Extra-Hazardous Business of Defendant: Corresponding High Degree of Care on Part of Plaintiff.** Because the defendant is engaged in an extra-hazardous business and the law for that reason imposes upon it the duty to exercise a very high degree of care to make its electric wires reasonably safe for those who in the performance of their duties are brought into contact with them, it cannot be held that the law imposes upon a skilled lineman in the employ of another company the corresponding duty to exercise the same high degree of care for·his own safety. His duty is to exercise the ordinary duty of a reasonably prudent man engaged in the same kind of work.

13. **EXCESSIVE VERDICT: $18,000.** Plaintiff was twenty-two years old, and prior to his injury was earning $100 per month, and since then $35 or $40. His life expectancy was 35 years. His net loss in wages up to date has been $4000. He was a skilled lineman, and when his hand came in contact with a live electric wire lying loose in a handhold to a pole he was ascending, 2300 volts of electricity poured through him for several minutes; he was rendered unconscious and was severely burned; the burns necessitated the amputation of most of his fingers and thumb, and all·that· remains of his hands are withered and gnarled stumps; and the mental and physical pain was beyond description. *Held*, that a verdict for $18,000 was not excessive.

14. **NEGLIGENCE: Maintenance of Nuisance: Liability.** On rehearing it is *held* that, if it be true, as contended, that the new pole which defendant was permitted by the city to erect, for the stringing of the electric wires of three companies, had been erected thirty feet from where the old pole had stood, and that none of the wires of the three companies had been attached to the new pole, then it was a public nuisance, since not placed where the permit had authorized it to be placed; and plaintiff having been injured while ascending it for the purpose of untangling the wires of his company, defendant is liable regardless of the question of negligence on its part, even though it exercised the highest degree of care, since the establishment and maintenance of a nuisance is a graver breach of the law than any act of negligence.

Appeal from St. Louis City Circuit Court.—*Hon. Eugene McQuillin*, Judge.

AFFIRMED.

*John H. Drabelle* and *Schnurmacher & Rassieur* for appellant.

(1) The demurrer to the evidence should have been sustained. The petition alleges that the permit granted on this application contained the "express condition" that the Kinloch Company, and its employees, should enjoy the same rights as to said pole that they theretofore had in the line of·old poles, and that defendant accepted this express condition. It is on this averment that plaintiff justified his presence on the pole when he was hurt. There is absolutely no evidence to support the averment. The only condition annexed to the permit was "same space to be reserved for wire-using companies, other than the city, that are now occupying space on said poles." At the time of the accident the line had not yet been transferred to the new poles, and the particular pole in question was barren of cross-arms or wires of any description. Plaintiff in his petition relies on specific allegations of negligence. He charges that the insulation on defendant's wire had become decayed, worn and disintegrated, and that in this condition the "defendant carelessly and negligently caused and suffered and permitted the said highly charged and dangerous wire and the said insulation thereon to be and remain in the condition, situation and under the circumstances aforesaid, from the date of the erection of said pole until the said 12th day of June, 1907." There is not one word of proof to sustain this allegation. Not a witness testified to such condition, or that the condition charged existed for the length of a minute before plaintiff mounted the pole. The evidence showed affirmatively that plaintiff's injuries were the direct result of his own carelessness. He was an experienced

lineman, engaged, because of his skill in this dangerous work, in clearing "trouble" among wires; he knew that every wire, whether used for light or power, telephone or telegraph purposes, was to be looked upon as dangerous; because, though ordinarily carrying a low voltage, it might at some distant point be crossed with a wire of high voltage; he knew also the danger of coming in contact with a metal step, itself in danger of contact with a wire, and especially dangerous on a damp, wet day; yet with his experience and his knowledge of danger he reached around the pole, without looking and without the protection of rubber gloves, when by looking he could have seen the danger and altogether avoided it, or by the use of rubber gloves could have neutralized it. Junior v. Electric Co., 127 Mo. 79; Railroad v. Dorsey, 119 Ga. 363; Judge v. Lighting Co., 21 R. I. 128, 23 R. I. 208; Light & Power Co. v. Moore, 55 Tex. Civ. App. 157; Gas & El. Co. v. Simpson, 109 S. W. (Tenn.) 1155; Hart v. Lighting Co., 201 Pa. St. 234; Railroad v. Simmons, 117 Tenn. 392. (2) The alleged negligence of defendant was not the proximate cause of the accident. Defendant was not bound to foresee that an experienced lineman and trouble man would use this new barren pole, not for the purpose of stringing or maintaining or repairing wires upon it, not for the use of any space reserved on it for his employer, but purely as a matter of convenience for the purpose of reaching away from it to untangle some of his company's near-by wires, and that in connection with such use he would in broad daylight and without the precaution of looking, take hold with one hand of a metal step on which a wire in plain sight was resting, and with the other hand take hold of another wire, and thus, with his body, complete a circuit for the electric current to pass through. Huber v. Railroad, 92 Wis. 636; Light & Power Co. v. Moore, 55 Tex. Civ. App. 157; Gas & El. Co. v. Archdeacon, 80 Ohio St. 27; Fuchs v. St. Louis, 167 Mo. 620. (3)

Plaintiff's instruction one is erroneous in several particulars. It bases plaintiff's right to use the new pole for the purpose of mere convenience, for which he used it, on the right of his company to use space on the old poles for other purposes; that is, for stringing and maintaining its wires. It omits all reference to an essential issue in the case. Plaintiff charged specific negligence, to-wit, that defendant's wire, in a dangerous condition, was allowed to be and remain on the iron step from the date of the erection of the pole to June 12, 1907, the day of the accident. The instruction permits a verdict for plaintiff if the jury should find merely that the wire was in contact with the step at the moment of the accident. The instruction authorized a verdict for plaintiff if the jury believed that the insulation on defendant's wire was inadequate and insufficient from any cause; whereas the specific charge of negligence in the petition is that the wire was dangerous, because it had been, "by long use, neglect and by the force of the wind and the weather, permitted to become decayed, worn and disintegrated, so as to expose said deadly current in said wire and permit the same to escape to the said iron step or hand-hold in said pole." (4) The court erred in modifying defendant's instruction three and in giving it as modified. As offered by defendant this instruction imposed on plaintiff, engaged in a highly dangerous and extra-hazardous employment, the duty of exercising a high degree of care for his own safety. The instruction was intended as a complement to instruction seven given for plaintiff, advising the jury that defendant was bound to exercise a very high degree of care to make its wires reasonably safe to those who, in the performance of their duties, might be brought in contact with them. The court, however, refused to give defendant's instruction as asked, and modified it by charging that plaintiff was only under the duty of exercising ordinary care for his own safety.

This was error.   Judge v. Lighting Co., 21 R. I. 128, 23 R. I. 208; Light & Power Co. v. Moore, 55 Tex. Civ. App. 157.   (5) The verdict and judgment are excessive.   Partello v. Railroad, 240 Mo. 122; Chitty v. Railroad, 166 Mo. 435, 148 Mo. 64.

*Blevins & Jamison* and *W. M. Williams* for respondent.

(1)  Appellant by thrusting the pole among the overhead wires and maintaining its defectively insulated high potential slacked wire without cross-arms or other support or fastening, and in suffering and permitting said wire to be in contact with the iron step so that the deadly current carried by it escaped on to the step that plaintiff had a right to use, and where his business required him to be, and where he was in the discharge of his duty as an employee of the Kinloch Telephone Company, was clearly guilty of negligence. Gleismann v. Electric Co., 173 Mo. 654; Von Trebra v. Gas Light Co., 209 Mo. 648; Trout v. Gas Light Co., 151 Mo. App. 207; Downs v. Telephone Co., 161 Mo. App. 274; Ryan v. Transit Co., 190 Mo. 621; Clark v. Railroad, 234 Mo. 396; Kile v. Light & Power Co., 149 Mo. App. 354; Booker v. Railroad, 144 Mo. App. 274; Braun v. Elec. Co., 35 L. R. A. (N. S.) 1089.   (2) Respondent went upon the pole in the line, in the performance of his duty to his employer, as was the custom and habit of the employees of all the companies having wires on the line, and appellant was negligent in maintaining its dangerous, uninsulated, unfastened, sagging wire in contact with the step, and is liable for respondent's injuries.   Downs v. Telephone Co., 161 Mo. App. 274; Trout v. Gas Light Co., 151 Mo. App. 207; Clark v. Railroad, 234 Mo. 396.   Appellant should have apprehended that the companies having wires on the line, and their employees would make use of the pole in the conduct of their business.   Byerly v.

Light, Power & Ice Co., 130 Mo. App. 593; Braun v. Genl. Elec. Co., 34 L. R. A. (N. S.) 1089. (3) The fact that appellant's wire was on the step and that respondent was shocked and burned as the result. of taking hold of the step with his hand, is conclusive proof that the insulation of the wire was defective, and of the negligence of the appellant. Geismann v. Elec. Co., 173 Mo. App. 654; Von Trebra v. Gas Light Co., 209 Mo. 648; Trout v. Gas Light Co., 151 Mo. App. 207. (4) As there was and had been a joint user of the line of poles by appellant, Kinloch Telephone Company, and other wire using companies, appellant was charged with the same duty toward respondent as toward its own employees. Trout v. Gas Light Company, 151 Mo. App. 207. (5) Respondent was exercising reasonable care for his own safety. The question of his contributory negligence was submitted to the jury by proper instructions. Geismann v. Elec. Co., 173 Mo. App. 654; Trout v. Gas Light Co., 151 Mo. App. 207. There is no substantial evidence that respondent's employer, Kinloch Telephone Company, had promulgated or enforced or had any rule requiring its employees to wear rubber gloves. Respondent had no notice that there was a rule of that kind. If at any time it had a rule requiring the use of rubber gloves, it was habitually violated by all employees. Francis v. Railroad, 127 Mo. 659. (6) The instruction on the measure of damages was correct both in form and substance. If the appellant thought the instruction was too general and left the jury too much latitude, it should have asked more specific instructions. Having failed to do so, it cannot now complain. Browning v. Railroad, 124 Mo. 71; Geismann v. Elec. Co., 173 Mo. 679; Wheeler v. Bowles, 163 Mo. 398; Waddell v. Railroad, 213 Mo. 18; Stoetler v. Railroad, 200 Mo. 140; Norris v. Railroad, 239 Mo. 717; Robertson v. Railroad, 152 Mo. 393; Wahl v. Transit Co., 203 Mo. 276; Bank v. Ragland, 171 Mo. 186; Duffy v. Transit Co., 104 Mo. App. 235; Smelting

Co. v. Parry, 166 Fed. 407; Moore v. Railroad, 226 Mo. 689; Railroad v. Maloney, 136 Fed. 171; 38 Cyc. 1693. (7) The claim again put forward by appellant in this court that the verdict remains excessive, notwithstanding it was cut down $4500 by the trial court, and judgment entered for $18,000, is without merit. Rodney v. Railroad, 127 Mo. 676; Dyke v. Railroad, 45 N. Y. 113; Guffy Co. v. Shelton, 69 S. W. (Tex.) 653; Smith v. Whittier, 95 Cal. 279; Harold v. Railroad, 24 Hun, 184; Railroad v. Kelly, 80 S. W. (Tex.) 1073; Moore v. Railroad, 226 Mo. 689.

WOODSON, J.—The plaintiff brought this suit in the circuit court of the city of St. Louis against the defendant to recover the sum of $35,000 damages for personal injuries sustained by him through the alleged negligence of the company.

A trial was had before the court and a jury, which resulted in a verdict for the plaintiff for $22,500. In proper time a motion for a new trial was filed, and among other reasons assigned therefor was that the verdict was excessive. After due consideration the court announced that if the plaintiff would remit $4500 of the verdict the motion would be overruled. In response to that announcement counsel for plaintiff entered a remittitur of $4500, and thereupon the court overruled the motion for a new trial, and entered judgment for the plaintiff for $18,000. In proper time and in due form defendant appealed the cause to this court.

There being no question raised as to the sufficiency of the pleadings, they will be put aside with the remark that they were sufficient to present the questions involved in this appeal.

The plaintiff's evidence tended to show that the city of St. Louis owned a line of poles erected along the north side of Loughborough avenue extending westward from Colorado street. The primary purpose of these poles were to support wires serving the fire de-

partment and telephone system of the city; but prior to the date of the alleged injury the city properly authorized the Bell Telephone Company, the defendant, the Union Electric Light & Power Company, and the Kinloch Telephone Company to construct and maintain cross-arms on said poles and to string and maintain their respective wires thereon. The wires of the city were the top ones, then came those of the Bell Telephone Company, then those of the Union, and lastly those of the Kinloch. Those of the former were strung on the south side and those of the latter were on the north side thereof.

The record does not definitely show how many wires all told were strung upon these poles, but they are referred to in various places as a large number, and in one place counsel for defendant state facts which show that there were at least twenty-four of them and also a large telephone cable.

The Union Company's wires were used for lighting purposes and carried about 2300 volts, and those of the Bell and Kinloch companies were for telephone purposes and each carried about fifty volts. Those of the city, as previously stated, were strung above and are of no consequence in this case.

On and for years prior to the date of the injury complained of, said poles and wires had been in constant use by the respective parties for the purposes mentioned.

All of the poles had the ordinary iron step or handholds (iron spikes) driven into them from opposite sides, some two and a-half feet apart, extending upward; that these steps or handholds were to enabel persons to ascend and descend the poles whenever the necessity of the business required.

The agents, servants and employees of the city and those of the three companies named, had equal rights to use the poles for the purposes mentioned. On or about February 15, 1907, the defendant applied to the

city for permission to remove old and unsuitable poles along the line mentioned, and to substitute new ones in lieu thereof.

In compliance with that application the city issued the following permits (formal parts omitted):

### No. 1.

Gentlemen:

In reply to your favor of the 15th inst., permission is hereby granted to replace city's poles with forty-foot poles located on the north side of Loughborough avenue, first pole west of Michigan avenue to the first pole west of Virginia avenue, and the first pole east and the first six poles west of Idaho avenue, under the following conditions:

Space to be reserved for use of city's wires.

Same space to be reserved for wire-using companies other than the city that are now occupying space on said poles.

The old poles to be taken down and hauled to city pole yards, Kingshighway and Eager road, free of expense to the city.

### No. 2.

Gentlemen:

In reply to your favor of the 15th inst., permission is hereby granted to replace city's poles with forty-foot poles located on the north side of Loughborough avenue, first pole east and first six poles west of Idaho avenue, under the following conditions:

Same space to be reserved for use of city's wires.

Same space to be reserved for wire-using companies other than the city that are now occupying space on said poles.

The old poles to be taken down and hauled to city's pole yard, Kingshighway and Eager road, free of expense to the city.

Permission has been granted to the Bell Telephone Company to replace the first pole west of Michigan avenue and the first pole west of Virginia avenue on the north side of Loughborough avenue.

In pursuance to the authority granted by said permits the defendants had from time to time removed old and unsuitable poles along the street mentioned, and had erected new ones in lieu thereof; all parties retaining the same space upon the new ones that they occupied upon the old, as well as the same rights to use them as they did the old ones. During the re-

moval of the old poles and the installation of the new, the business or service of all of said parties was continued, as though no change had been going on, save and except the incidental interferences thereto necessitated by the substitution. The new poles, as the old, were used by the agents, servants and employees of all of said parties in constructing, inspecting and repairing their respective systems of wires.

A short time prior to July 12, 1907, the date when plaintiff was injured, the defendant removed one of the old poles, which was located at a point about two hundred feet west of Colorado street, on said Loughborough avenue, and had erected a new pole in its stead, with the footsteps or handholds driven therein, but none of the wires of any of the parties had at that time been attached to the pole. In fact, if I correctly understand the record, the cross-arms upon which the wires are strung, had not been installed; at any rate, none of the wires had been attached to that pole, either directly or indirectly; yet it had been erected with the handholds in place, and extended upward among the wires of the city and those of the various companies mentioned.

In the night of July 11, 1907, there was a wind and rain storm in the city of St. Louis; the velocity of the wind being about thirty miles an hour and the rainfall was about seven-tenths of one inch. Not an unusual storm. In fact, the United States Signal Service records introduced in evidence showed that some ten or twelve days prior thereto the wind traveled at the rate of about fifty miles an hour, and that the rainfall was about one and one-tenth of an inch in depth. On the 12th of July, 1907, the plaintiff, an employee of the Kinloch Company, in the capacity of a "trouble" man, that is, one who is so well skilled in his business that he is selected as one of the force of several to investigate and find any and all defects and troubles that exist along the lines of the company which interfere

with or destroy the service of the company and to repair the same when discovered, was sent out to find the trouble with the company's service on Loughborough avenue west of Colorado street. After resorting to the proper tests he located the trouble at the new pole previously mentioned; and after so doing he examined the cable-box erected by the Kinloch Company a few blocks from the point of trouble, by which he discovered the character of the trouble, that is, that it was a slight, and not a heavy or dangerous, current of electricity that was passing from some other wire to the one he was directed to investigate. (By the way, the cable-box mentioned, or "terminal junction" as some of the witnesses term it, is so constructed that whenever a heavy or dangerous current passes over the wires of the Kinloch Company, the fuses thereof are instantly burned or blown out, immediately indicating the presence of a dangerous current.) Having thus ascertained that no deadly current was passing over the wires he was investigating, plaintiff proceeded along the line of wires in search of the trouble, and upon coming to the new pole mentioned he discovered the trouble. It consisted of an entanglement of one of the wires of the Kinloch Company with one of those of the Bell Company, at a point some eight or ten inches from said new pole.

In order to correct the trouble, the plaintiff ascended the pole in the usual manner, and while engaged in disentangling the wires he received the injuries complained of.

The manner of the injury is best told in plaintiff's own language, which is substantially as follows:

"Q.   When you went down on that line, tell the jury what you did first? A.   I went to the cable-box first.

"Q.   Tell the jury what you did and what this is? A.   That is the terminal of the cable and the wires were distributed from that terminal out to the line

wires—aerial wires—and then they run to the tele-
phones, and I go to that cable head—we have fuses,
both carbon and metal fuses, and I go over and see that
the line is not grounded or that the fuses are not
open—been opened by heavy current or a high voltage
passing through that wire. I went to that box and
found both fuses in good condition and no grounding
of the carbon fuses, and I started to trace that line.
From that head I got the cable path. The pairs are
numbered; I get them from the wire chief for that
line, circuit 4, and I trace those wires over that lead
until I come to Colorado and Loughborough, and then
as I was looking up, I took in the whole situation and
saw the wires there and everything looked all right
to me, except the wire I was working on, which was
what we call 'crossed up' with a Bell circuit also, and
I climbed that pole and got in position on the pole
standing on the steps with one foot and felt around
with the knee and the other one, and as I reached for
the wire with my hand I reached for the step on the
other side to keep my balance—the wires were out to
the north side of the pole—and I reached for the south
side, and at that time I received a shock, made me un-
conscious and I don't know—I didn't come to until I
was in the patrol wagon being hauled away from the
spot.

"Q. Did you touch any other wire or what wires
did you touch when you were on that pole? A. I
touched the Kinloch wires.

"Q. Did you touch any other wire? A. No,
sir.

"Q. When you first approached the pole, what did
you do when you first came up there at that point?
A. I was looking up toward the wires and found my
trouble there and found that the Kinloch wires were
crossed with the wires but they looked all right. I
didn't notice anything wrong—anything particularly
wrong.

"Q. Did you see anything of any wire on any step? A. No, sir, I didn't notice anything of that kind.

"Q. How high in the air were those wires of your company? A. I should say twenty or twenty-five feet.

"Q. Does that affect the way you answer as to how those wires were strung between these poles? A. No, the Kinloch was the bottom and the light wire was the next.

"Q. How much higher is one gain than another? What is the distance between them? A. Fourteen to sixteen inches.

"Q. How much higher were the light wires than the Kinloch wires of this line between these two poles? A. Fourteen or sixteen inches apart at the bottom.

"Q. In answer to Mr. Drabelle you said the Kinloch wire was about ten inches north of the new pole you were on. Where was the trouble you were talking about? A. Right at the pole I was on.

"Q. In running that line leading up to the pole where you found the trouble, did you notice whether any of these particular wires were insulated or not? Could you tell? A. Yes, sir.

"Q. Did they look like they were insulated? A. Yes, sir.

"Q. Did you touch any wire while you were on that new pole except the Kinloch wire you were talking about? A. No, sir.

"Q. Mr. Drabelle was asking you about looking at this wire on that new pole, and you said something about being twenty-five feet away. Tell the jury what you mean by that? A. When I was tracing out the circuits before I got to the seat of trouble, I was looking up all the time, and when I got there I was looking up, when I saw my wires in trouble and I saw the whole general—all the wires in general, above my head from the ground, and I immediately climbed the pole

and got in position to clear my trouble and took hold of this step and received my shock.

"Q. In looking at that to see what was up there, did you notice whether any of the wires were touching these spikes? A. No, sir, they didn't appear to be. They looked all right."

The first person who appeared at the scene of the accident after its occurrence was Wilkerson Sneed, who testified in behalf of plaintiff, that he went upon the pole in question and took respondent down to the ground after his injuries. There was a large cable in the line which was strung a short distance below all the other wires and ran along on the south side of the new pole. When respondent was injured the upper part of his body fell over and upon this cable. His feet and spurs clung to the pole, and left him suspended in the air. Mr. Sneed said he did not see, at the time, the contact of the appellant's light wire with the step on the pole, but that shortly afterwards he noticed the contact of the wire with the step. He testified as follows:

"Q. State whether or not you noticed anything about any wire being hooked up on that pole or not? A. Not right at that time, no, sir.

"Q. Did you that afternoon at any time? A. Yes."

There were three or four other witnesses introduced who appeared upon the scene shortly after the accident; two of whom testified that they never noticed that the defendant's wire was hooked on to the foot or handhold of the pole, and the others testified that they did observe that fact. One or two of them also testified that they noticed a black or charred spot on the pole where the defendant's wire came in contact with it, at or near the handhold.

Some of these witnesses also testified that they noticed that there was a sag in the defendant's wires near said pole.

The plaintiff charged in the petition, and his testimony tended to prove, that it was the universal custom among the employees of all of the companies using the poles to go upon, ascend and descend any and all of them for the purpose of adjusting any trouble that might be reached therefrom, whether such pole was a new one or an old one, or whether it had cross-arms on it or not.

S. W. Way, the electrician and general superintendent of the defendant, and John G. Regan, the inspector of the city lighting department of the city of St. Louis, and T. J. Keller, an employee of the Kinloch company, testified regarding said custom substantially the same as did the plaintiff.

At the time the plaintiff was injured he was wearing a pair of leather gloves, for the purpose of protecting his hands from the ordinary injuries when coming in contact with wires or other physical substances in the performance of his duties, and not from electrical currents. There was no rule of the Kinloch Company or any custom among the employees thereof requiring them to wear rubber gloves while performing the duties in which the plaintiff was engaged. While defendant introduced some evidence to the contrary, yet practically all of it was confirmatory of that of the plaintiff.

The plaintiff sustained severe and permanent injuries and suffered intense physical pain and mental anguish; practically both hands were burned off, necessitating the amputation of nearly all of his fingers and thumbs, and all that remains thereof are but withered, gnarled and useless stumps; he received many other severe burns about his person; and was permanently disabled from performing the duties of his calling, and has been almost incapacitated from doing any kind of manual labor, not capable of earning more than one-third of what he was earning prior to his injury, which was about three dollars a day. At the

time of the injury the plaintiff was thirty years of age, and according to mortuary tables introduced in evidence his expectancy of life was some thirty-five years.

At the close of the plaintiff's evidence the defendant asked an instruction in the nature of a demurrer thereto, which was by the court overruled, and the latter duly excepted.

Thereupon the defendant introduced its evidence; but after a careful consideration of the same we find that there is but little conflict between it and that introduced for the plaintiff, aside from that regarding the custom of the employees of the various companies using the old and new poles in making repairs and correcting troubles along the line of poles and wires, such as are mentioned in the evidence and regarding the rule and custom among the employees of the Kinloch Company to use rubber gloves while performing such services as those in which the plaintiff was engaged at the time he was injured.

So slight was the conflict, counsel for defendant have not deemed it necessary to call attention to it in their statement of the case, but have relied almost solely upon the testimony of the witnesses for the plaintiff, as the basis of their statement.

Whatever additional evidence it may be necessary to consider in the discussion of the legal propositions involved will be noticed in connection therewith.

At the close of the introduction of all of the evidence, the defendant asked the court to give a peremptory instruction requiring the jury to find for it, which request was by the court refused, and defendant duly excepted.

Thereupon the plaintiff requested, and the court over the objections and exceptions of defendant, gave him the following instructions:

"1. If you find from the evidence that the city of St. Louis was, on the 12th day of June, 1907, and for several years prior thereto had been, the owner of

the line of poles mentioned in the evidence, and that during said years the said city of St. Louis, the defendant company and the Kinloch Company, and other wire-using companies, had strung and were maintaining wires in said lines of poles by and with the consent of the said city of St. Louis, and had, during said period, the use of said line of poles, and that during said time it had been and still was on the 12th day of June, 1907, the habit and custom of the employees of all said companies so having wires on said line and so using same, to go upon any and all the poles in the said line at any and all times, whenever necessary for the purpose of untangling and keeping their said wires in repair and in proper and safe condition; and,

"If you further find from the evidence that the defendant at all said times knew of such use being made of said wire and poles by the said companies and their said employees; and,

"If you further find from the evidence that said city of St. Louis issued the several permits read in evidence, and that the defendant company, acting under permits issued to it by the said city of St. Louis, set up in said line, and as a part thereof, some new poles to take the place of some of the old poles in said line, and that one of the said new poles so erected by the said defendant company, was set at a point in said line on the north side of Loughborough avenue, at a point about two hundred feet west of Colorado avenue in said city of St. Louis, and that said new pole was equipped with two rows of iron steps or spikes for use as handholds and steps by its own employees, and the employees of the other companies having wires on said line, in climbing said poles, and that in erecting said pole, defendant put the top of the same among and between the wires in said line; and,

"If you further find from the evidence, that the wires of the defendant company in said line carried and were charged with a powerful current of electricity of

high voltage, and by reason of being so charged said wires were at all said times and continued to be on the said 12th day of June, 1907, dangerous to life and limb, and were so known to be by the defendant at all said times; and,

"If you further find from the evidence that the defendant carelessly and negligently failed to put cross-arms on said new pole to support its said wires, or to otherwise fasten or secure said wires, and that defendant carelessly and negligently suffered and permitted its said wires or one of them to become slack and loose and to sag, and to come, and to be, and to remain in contact with one of the said iron steps or handholds in said pole; and

"If you further find from the evidence that the said wire so in contact with the said iron step was at all said times charged with and carried a powerful electric current of high voltage; and

"If you further find from the evidence that the insulation on said wire was inadequate and insufficient to prevent the said electric current of high voltage from escaping from defendant's said wire to the said iron step or handhold, and that said current was by reason of such inadequate and insufficient insulation escaping and being communicated from said wire to said iron step, and causing said iron step to be charged with electricity from defendant's wire; and,

"If you further find from the evidence that by reason of the aforesaid conditions of the said pole, iron step and wire, the same were on the said 12th day of June, 1907, not reasonably safe but were dangerous for the employees of said wire-using companies, who might have occasion to go upon the said new pole in the discharge of their duties as such employees, and that the said defendant company at said time knew, or by the exercise of reasonable care would have known of such unsafe and dangerous conditions; and

"If you further find from the evidence that on the said 12th day of June, 1907, the plaintiff was in the employ of the said Kinloch Telephone Company, and was required by said company on said date to go along the said line of poles to repair, straighten out, and untangle the wires of the said Kinloch Telephone Company in said line, and that the plaintiff in the discharge of his duties as such employee did go along such line of poles, and upon the said new pole for the purpose of untangling the wires of the said Kinloch Telephone Company in said line; and,

"If you further find from the evidence that the plaintiff, while upon said new pole, attempted to straighten out and disentangle the wires of the said Kinloch Company in said line and was in the act of disentangling the said wires, and that while so doing plaintiff took hold of the said iron step, with which defendant's wire was in contact, for the purpose of balancing himself on said pole, and was then and thereby burned and shocked by the electric current from defendant's said wire communicated to the said iron step in said pole; and,

"If your further find from the evidence that the plaintiff was at all said times in the exercise of ordinary care for his own safety, then you will return a verdict for the plaintiff.

"2.    It was the duty of the defendant company to protect its wires carrying a powerful and dangerous current of electricity by insulation or otherwise and to use a very high degree of care to keep such insulation or protection of such wires in such condition and repair so as to make them reasonably safe to those, who in the performance of their duties, might be brought in contact with them.  A failure to exercise such care would constitute negligence.

"By the term 'very high degree of care' as used in this instruction is meant that degree of care which would ordinarily be exercised under the same or simi-

lar circumstances by cautious and prudent persons engaged in the same line of business.

"3. 'Ordinary' care, as used in these instructions with reference to the plaintiff, is meant that degree of care which careful and prudent persons engaged in the same business and calling as that of the plaintiff would ordinarily exercise under the same or similar circumstances.

"4. If under the evidence and instructions of the court, you find in favor of the plaintiff, you should assess his damages at such an amount as you believe, from the evidence, will be a fair compensation to him for the pain of body and mind, if any, which he has suffered as a direct result of the injuries in question, and for such permanent injury, if any, to plaintiff's hands as you may find was directly caused by the said injuries, and for such loss of earnings, if any, as you may believe from the evidence he has sustained in consequence of his said injuries and for such loss or impairment of his earning power or capacity, if any, as you may find from the evidence he will, in all reasonable probability, sustain in the future in consequence of his said injuries, but the total damage which you may allow plaintiff must not in any case exceed the sum of thirty-five thousand dollars."

The defendant then asked certain instructions, which the court refused, but modified them and gave them in the following form:

"1. Even though you may find and believe from the evidence that the defendant from the date of the erection by defendant of the new pole mentioned in the evidence, and being the first pole west of Colorado street on the north side of Loughborough avenue, city of St. Louis, to the time of the injury to plaintiff, caused, suffered and permitted one of its highly charged wires to come and be and remain in contact with one of the iron steps or handholds on the south side of said pole, yet unless you find and believe from

the evidence that said iron step or handhold was caused to be charged with electricity because insulation on said wire in contact with it had been by long use, neglect and by force of the wind and the weather, permitted by the defendant to become decayed, worn and disintegrated, your verdict must be for the defendant.

"2. It was the duty of the plaintiff to himself exercise ordinary care for his own safety, and if you believe and find from the evidence adduced before you in this cause, that he was an experienced telephone lineman and that because of his age, experience, and employment he knew or should have known of the danger of placing his hand on the iron step or handhold of the new pole mentioned in the evidence on which was lying, or in contact with which was, one of defendant's highly charged wires, if you find and believe from the evidence that one of the defendant's said wires was so lying on or in contact with said step or handhold from the date of the erection of said pole to the time of the injury to plaintiff, and that said step was charged with electricity because the insulation on said wire had been by long use, neglect and by force of the wind and the weather permitted by defendant to become decayed, worn and disintegrated, and at the same time take hold with his other hand of a wire or wires of the Kinloch Telephone Company, and if you further believe and find from the evidence that the plaintiff saw, or could by the exercise of ordinary care have seen the said wire in contact with said step, then your verdict must be for the defendant.

"3. If you believe from the evidence that the plaintiff and the defendant were both guilty of negligence, which directly contributed to plaintiff's injury, then your verdict must be for the defendant.

"4. The defendant at the time of the accident to plaintiff had the right to string and maintain in the city of St. Louis and at the place of said accident wires carrying high tension current of electricity, and the

mere maintenance of such wires carrying such current was not negligence.

"5. If you believe under the evidence that the electric current on defendant's wire escaped to the iron step mentioned in the testimony, not because the insulation or covering on said wire had been permitted by defendant to become decayed, worn and disintegrated, but because the same was wet or damp, then your verdict must be for the defendant."

To which action of the court in so modifying the instructions requested to be given by the defendant and in giving said instructions as so modified, the defendant, by counsel, then and there duly excepted.

The court, of its own motion, also gave to the jury the following instructions on behalf of the defendant.

"6. The burden of proof is on the plaintiff to establish by a preponderance of the evidence the facts necessary to a verdict in his favor under these instructions, except upon the issue concerning the exercise of ordinary care by the plaintiff. As to that issue the burden of proof is on defendant to show the want of such ordinary care on the plaintiff's part.

"7. By the terms 'burden of proof' and 'preponderance of the evidence,' the court intends no reference to the number of witnesses testifying concerning any fact, or upon any issue in the case, but simply uses those terms by way of briefly expressing the rule of law, which is, that unless the evidence (as to such issue) appears in your judgment to preponderate, in respect to its credibility, in favor of the party to this action on whom the burden of proof (as to such issue) rests, then you should find against such party on said issue.

"8. Nine of your number have the power to find and return a verdict, and if less than the whole of your number, but as many as nine, agree upon a verdict, the same should be returned as the verdict of the jury, in which event, all the jurors who concurred in such ver-

dict shall sign the same; if, however, all of the jurors concur in a verdict, your foreman alone may sign it.''

To which action of the court in giving the aforesaid instructions of its own motion, the defendant, by counsel, then and there duly excepted.

Such of defendant's refused instructions as may be necessary to consider, in order to reach a proper conclusion in the case, will be noted later.

I.    It is first insisted by counsel for the appellant that the trial court erred in not sustaining the demurrer to the respondent's evidence, asked by it; also that it erred in not giving, at the close of the introduction of all the evidence in the case, the appellant's peremptory instruction telling the jury to find for it.

The grounds of that insistence are thus stated by counsel for appellant:

''(a)    The new pole on which plaintiff met with his accident was erected pursuant to an application to the Board of Public Improvements under date of February 15, 1907.    The petition alleges that the permit granted on this application contained the 'express condition' that the Kinloch Company, and its employees, should enjoy the same rights as to said pole that they theretofore had in the line of old poles, and that defendant accepted this express condition.    It is on this averment that plaintiff justified his presence on the pole when he was hurt.

''There is absolutely no evidence to support the averment.    The only condition annexed to the permit was 'same space to be reserved for wire-using companies, other than the city, that are now occupying space on said poles.'    At the time of the accident the line had not yet been transferred to the new poles, and the particular pole in question was barren of cross-arms or wires of any description.

''(b)    Plaintiff in his petition relies on specific allegations of negligence.    He charges that the insula-

tion on defendant's wire had become decayed, worn, and disintegrated, and that in this condition the 'defendant carelessly and negligently caused and suffered and permitted the said highly charged and dangerous wire and the said insulation thereon to be and remain in the condition, situation and under the circumstances aforesaid, from the date of the erection of said pole until the said 12th day of June, 1907,' etc. There is not óne word of proof to sustain this allegation. Not a witness testified to such condition, or that the condition charged existed for the length of a minute before plaintiff mounted the pole.

"(c)  The evidence showed affirmatively that plaintiff's injuries were the direct result of his own carelessness.  He was an experienced lineman, engaged, because of his skill in this dangerous work, in clearing 'trouble' among wires; he knew that every wire, whether used for light or power, telephone or telegraph purposes, was to be looked upon as dangerous; because, though ordinarily carrying a low voltage, it might at some distant point be crossed with a wire of high voltage; he knew also the danger of coming in contact with a metal step, itself in danger of contact with a wire, and especially dangerous on a damp, wet day; yet with his experience and his knowledge of danger he reached around the pole, without looking and without the protection of rubber gloves, when by looking he could have seen the danger and altogether avoided it, or by the use of rubber gloves could have neutralized it."

We will consider those grounds in the order stated.

Regarding (a): It is perfectly apparent that counsel for appellant misconceive the scope and effect of the permits issued by the city of St. Louis **Permit to Use Electric Wire Poles.** to their client, the Union Electric Company, authorizing it to remove old poles and substitute new ones in lieu thereof.

These permits, like all other permits, must be read and construed in the light of the facts and circumstances that existed and surrounded the parties at the time of their issuance.

At that time the city of St. Louis owned a line of poles extending along Loughborough avenue, upon which, and prior thereto, it had strung wires for the use of its fire department and telephone system; and upon application made by the various companies mentioned for permits to erect poles thereon for their respective lines, it became obvious that, if granted, the street would be so completely filled and obstructed by poles and wires that it would, for the purposes for which it was acquired, be practically destroyed, and at the same time would greatly interfere with the ingress and egress to private property abutting thereon, to say nothing of the obstruction of light and air, and the interference with protection against fire, etc. In order to avoid this undesirable condition of things the city conceived the idea that the situation might be in a large degree relieved by permitting all three of said companies to place cross-arms upon its poles and string their respective wires thereon, and while thereby increasing the number of wires upon its poles, yet at the same time preventing the obstruction of the street with three additional lines of poles. After proper negotiations and understandings reached, that method was adopted, and the wires of the three companies were from time to time added to the poles of the city, which at all times had footsteps or handholds driven therein, for the purpose of assisting the employees of the city in ascending and descending the poles in looking after, caring for and repairing the wires, cross-arms or other parts of the plant above ground.

When the respective companies added their lines of wire, either by tacit consent or express agreement, their respective employees, as did those of the city, began to use said poles for said purposes; and whether

there was an express agreement to that effect or not
is wholly immaterial, for the simple reason that the
granting of the right by the city to the companies to
use the poles for the purposes mentioned, would carry
with it all reasonable uses thereof which were neces-
sary to properly conduct their business, which of course
would and did include the right to use the poles in
making repairs and removing obstructions to their
wires, etc., and other property attached thereto. And
when the city granted to the appellant the permits pre-
viously mentioned to remove old poles and substitute
in their stead new ones the same rights and privileges
of the Kinloch and the other companies had to the old
ones attached to the new poles. This being unquestion-
ably true, then it must necessarily follow therefrom
that the respondent, an employee of the Kinloch Com-
pany, in the performance of his duties to it, when he
discovered the trouble he was sent out to locate and
remedy, which was within eight or ten inches of the
pole mentioned, had the legal right, independent of cus-
tom, to ascend the pole and remove the obstruction.
This is based upon the familiar principle of law which
provides that when an express power or authority to
do a particular thing is granted by the State to a mu-
nicipality or by the latter to an individual or corpora-
tion, then such additional power as is necessary to
enable the city, the individual or corporation to carry
into effect the express grant, is also conferred by nec-
essary implication. [City of St. Louis v. Bell Tele-
phone Co., 96 Mo. 623.]

We are, therefore, clearly of the opinion that this
ground of the insistence is not solid, and should be
brushed aside.

Attending (b): Under this paragraph it is con-
tended that there was no evidence introduced tending
to prove the specific allegations of the
petition regarding the decayed, worn
and disintegrated condition of the in-

Insulation of
Electric Wires.

sulation of the appellant's wires, at the point in question, which were thereby rendered unsafe and dangerous to respondent and all others who were rightfully using the poles.

Without stopping here to decide that proposition, but conceding for the sake of the argument that it is true, yet that would not avail appellant anything in this case, for the simple reason that all the evidence in the case, both that of appellant and respondent, shows that the insulation was wholly worthless as a protection to the employees of the various companies; and that of the former went so far as to show, without pleading it as a defense, that no insulation manufactured was sufficient for that purpose. The appellant's superintendent repeatedly so testified without qualification or equivocation. So under this view of the evidence what cares the law whether the insufficiency arose from decay, wear or disintegration of the insulation or from any other cause for that matter? The question involved in this case is, was the insulation reasonably safe for the purposes for which it was being used, and if not, did the appellant know that fact? As previously stated, all the evidence for both parties showed its insufficiency and that the appellant knew that fact, because it contended that it was not only impossible to so manufacture it as to make it reasonably safe, but for that reason it insisted that the respondent was guilty of contributory negligence for not wearing rubber gloves upon the occasion when he was injured.

Had the contention of the appellant, namely, that it was possible to insulate wires of the character of those in question so as to make them reasonably safe for those whose duties required them to work about and among them, been pleaded as a defense and thereby an opportunity been given the respondent to have met the issue, and the appellant's evidence had been the same as disclosed by this record, then quite a different

question would have been presented here for determination; but under the present status of the record that question is purely speculative and foreign to the merits of this case.

Entertaining these views of this ground of appellant's insistence, we are clearly of the opinion that it is wholly without merit, and should be disallowed.

The last ground (c) assigned by counsel for appellant as error in the action of the court in refusing to give the demurrer to respondent's evidence and in declining to peremptorily instruct the jury to find for appellant at the close of all the evidence in the case, embraces a much wider range and requires a much fuller consideration of the evidence introduced, for the reason that it involves the main defense interposed by appellant to respondent's right to a recovery, namely, contributory negligence.

Demurrer to Evidence: Experienced Lineman.

The substance of this contention is, that the record discloses that the respondent was an experienced lineman, and was engaged by the Kinloch Company as a "trouble" man because of his knowledge of such matters and his skill in the discovery and repair of all breakdowns and other obstructions which might interfere with its service due to the public; and that as a necessary incident thereto he must have known and did know that all the wires strung upon the line of poles mentioned in the evidence, whether light or telephone wires, were liable to be charged with deadly currents of electricity, by reason of the fact that, for various reasons not necessary to be here mentioned, the phone wires, the ones the respondent was repairing, were liable at any time to come in contact with the light or other wires carrying a deadly voltage, which would render them as dangerous to life and limb as the light wires themselves would be; that knowing those facts the law imposed upon the respondent the duty to exercise the highest degree of care known and exercised

by a very prudent person engaged in the same or similar service; and that in the case at bar, counsel for appellant contend, the evidence shows that respondent exercised no such degree of care, and for that reason he was guilty of contributory negligence and was not therefore entitled to a recovery.

Technically speaking and legally also in my opinion, yet controverted by others, the plea of contributory negligence by necessary implication admits negligence on the part of him who makes the plea; but in this case, as in many others, counsel for appellant insist that respondent was guilty of contributory negligence, and at the same time maintain appellant was guilty of no negligence in the case whatever.

Without stopping to discuss the abstruse rule mentioned, I will in passing state (for myself only), that if the defendant in a cause was not guilty of negligence, but the injury was caused by the sole negligence of the plaintiff, then the plea of contributory negligence is improper, and the plea should have been a general denial, or a plea that the injury was the result of the plaintiff's own negligence and not that of the defendant.

In fact, the answer of appellant filed in this cause is of the character last suggested, but in the course of the trial counsel seem to have confused the difference between the two pleas and proceeded largely upon the theory of contributory negligence on the part of respondent; but desiring to decide the case upon the merits rather than on technical pleadings, we will no further press that question. Since, however, the questions of negligence and contributory negligence, as presented by this record are so clearly connected and interwoven with one another, we will consider them together at this place, for what is said of the one may admit or exclude the other and *vice versa* according to the position taken by counsel for the respective parties.

In the first place, was the appellant guilty of any negligence which caused the respondent's injury? In my opinion, clearly it was; and my reasons for so stating will follow.

It is conceded that the appellant was engaged in a hazardous business, which required of it the exercise of the highest degree of care, if it was not an insurer against injury to others. [Von Trebra v. Gaslight Co., 209 Mo. 648, and numerous cases reviewed therein.]

It is also practically conceded that at the point of the injury the appellant, for its own benefit, removed the old pole upon which all of the wires of all the companies mentioned were strung and had inserted in lieu thereof a new pole; but at the time of the injury it had not put in place the cross-arms or attached thereto the wire of the various companies, as it was bound to do under the permits previously issued to it by the city.

While there is no direct and positive evidence upon the question, yet it is clearly inferable from the facts and circumstances in the case that the sagging of appellant's wires and the resting of the one which caused the injury to respondent upon one of the iron steps or handholds on the new pole, was caused by the appellant's removal of the old pole and the insertion of the new one, and its neglect or failure to place the cross-arms in place and to attach the wires thereto as they had been on the old pole. The very purpose of the poles and cross-arms are to support the wires and hold them as near taut as practicable, in order to prevent them from sagging and waving to and fro, and thereby interfering with or injuring those on the streets or those who might lawfully be upon the poles or in the vicinity of the wires.

There is no other reason assigned for the loose and sagging condition of appellant's wire, and as known from common observation the removal of a pole upon which wires are strung will cause them to sag

and wave to and fro in a strong wind; and in our opinion the jury were perfectly justified in finding as it evidently did, that that was the cause of the sagging of appellant's wires and the strong wind of the night before the injury was the cause of the wire resting upon the iron footstep or handhold, which, when respondent took hold of it conducted the current of electricity to his body with the frightful results disclosed by this record.

To hold that this evidence did not tend to prove negligence on the part of appellant would do violence to every principle of law bearing upon that subject. [Clark v. St. Louis & Suburban Ry. Co., 234 Mo. 396; Von Trebra v. Gaslight Co., 209 Mo. 648, and cases cited; Clark v. Union Iron & Foundry Co., 234 Mo. 436.]

We therefore rule that appellant was guilty of the grossest kind of negligence and that respondent was entitled to a recovery, providing he was not guilty of negligence which contributed directly to his injury.

We will now consider the question of respondent's contributory negligence.

Counsel for appellant strenuously insist that the respondent was guilty of the grossest kind of contributory negligence, and that under no principle of law applicable to the facts of this case was he entitled to a recovery, and for that reason, if for no other, it contends the trial court should have peremptorily instructed the jury to find for it; while upon the other hand counsel for respondent with equal zeal and earnestness contend: First, that there is no evidence contained in this record which tends to prove contributory negligence on his part; and, second, that even though they be mistaken in that contention, still they insist that the defense of negligence and of contributory negligence on the part of the respondent must have been charged and proved by appellant to the reasonable satisfaction of the jury in order to bar his

right of recovery, on account of appellant's negligence, as previously stated.

These respective contentions sharply present the question of contributory negligence on the part of the respondent, and having anticipated the importance of the same, I deemed it necessary to deal somewhat extensively with the evidence bearing thereon when making the statement of the case.

We have already considered the evidence of negligence on the part of the appellant, and the legal effect of the same, which eliminates the necessity for further comment thereon; so consequently we will briefly consider the evidence bearing upon the question of contributory negligence, which is fully set out in the statement of the case, and the legal effect thereof.

The substance of the evidence relied upon by counsel for appellant showing contributory negligence is as follows: That the respondent was what is known in the electrical business as a "trouble" man; that is, one who is an intellectual and practical master of the operation of the field portion of such a business, as well as the necessary connections and relations thereof with the plant and machinery that generates the electricity and distributes it throughout the various ramifications of those parts of the city and country served by the company; and consequently, as an incident thereto, he should have known and did know the attending dangers incident thereto, and should have exercised on his part the same high degree of care for his personal safety in making all repairs to the field work that the appellant was required to exercise for the safety of others in all branches of its business; that it was at all times dangerous to both life and limb for any one to take hold of or come in contact with any electrical wire, whatever the voltage thereof may be, while any portion of his person is in contact with any other wire or electrical conductor, and *vice versa*, without first insulating himself by wearing rub-

ber gloves, boots or some similar well known noncon-
ductor of electricity, for the well-known reason, so
forcefully assigned in briefs by counsel for appellant,
namely, that any and all wires, whatever their voltage
may be, high or low, may for many reasons too numer-
ous to be here mentioned, at any time, become broken or
detached from their moorings and through falling or
otherwise coming in contact with other wires or objects
near to or far removed from any given points and may
thereby conduct a high-voltage wire to a telegraph
or telephone wire, which respectively carry a very
small and noninjurious voltage, and thereby convert
the noninjurious wire into one of the same dangerous
character as the one which carries a high voltage; and
that knowing all of those facts and the danger attend-
ing the same, especially so soon after the storm of the
night before, the respondent should have insulated him-
self and having failed to so do, he was guilty of such
contributory negligence that he is not, as a matter of
law, entitled to a recovery in this case.

Counsel for appellant go so far as to contend that
even though the high-voltage wire was insulated with
the best insulation known to science and used in the
commercial world, still the respondent in this case was
not entitled to a recovery for the simple reason that he
did not use rubber boots or rubber gloves, etc., in mak-
ing the repairs on the Kinloch wires mentioned in the
evidence; and for that reason alone the court should
have declared as a matter of law that the respondent
was not entitled to a recovery.

A complete answer to that contention is, the rec-
ord nowhere shows that respondent was injured by
reason of a high-and low-voltage wire coming in con-
tact with the iron handhold of the pole upon which the
respondent was ascending. However, we will not let
the case turn upon this narrow, though solid, point,
but will meet the proposition as presented by counsel
for appellant.

That insistence is more plausible than sound, for the reason that if it be true, as counsel for appellant contend and as some of its evidence tended to prove, that there was no insulation known to science which would render wires of high voltage free from danger to those who came in contact with or handled them, counsel in the same breath insist with greater zeal that if respondent had only used rubber gloves or rubber boots in making the repairs mentioned, then all danger to him would have been completely removed and that he not only would not, but could not, have sustained the injuries complained of.

The plain fallacy of counsel's position consists in the contention that science has discovered no insulation which can perfectly insulate a wire of high voltage and thereby render the handling of the same noninjurious, yet in the same breath insist that science has by a compartively inexpensive device produced a rubber glove which, when worn, will completely remove all danger to those who handle such wires with such rubber gloves.

It does not arise to the height of respectable nonsense to contend that science can and has so insulated the hand as to make it safe for one to handle a wire of high votlage and then in the next breath insist that science has not and cannot insulate a similar wire with a similar substance with like results.

Moreover, that contention is in direct conflict with common observation and is disproved by common knowledge. If it was not for the perfect insulation of wires carrying high voltage or for some other equally protective system such as are thrown about trolley wires, how long would any or all of the great cities of this and other countries exist? I dare say that should all insulation be removed from all such wires but few of such cities would survive the night. But independent of all that, the great weight of the evi-

dence in this case as previously set forth in the statement of the case, shows that this contention of appellant is not only not true, but also that there was no rule promulgated by the Kinloch Company requiring the respondent or any of its employees to wear rubber gloves while performing the services for which he was engaged.

That is true not only of the Kinloch Company, but is true of all other companies engaged in similar business. Not only that, the great weight of the evidence introduced by both the appellant and respondent almost conclusively shows that none of the employees of the Kinloch or of any of the other companies mentioned ever wore rubber gloves in the performance of the duties the respondent was engaged in when injured.

I am, therefore, clearly of the opinion that there is absolutely no merit in this element of appellant's contention of contributory negligence.

It is next insisted, along this line, by counsel for appellant, that the respondent is not entitled to a recovery in this case for the reason that he was guilty of contributory negligence in that he should have seen, and would by the exercise of ordinary care have seen, the sagged condition of its wire and its contact with the handhold on the pole, had he exercised ordinary care in looking out for his own safety. That is, since he was looking for "trouble" along the wires of the Kinloch Company, which he was required to adjust, he should also have looked for any and all defects that existed along the lines of the appellant, and of course, by parity of reasoning, those of the city of St. Louis and Western Union Telegraph Company, all of whose wires (at least twenty-five in number) were strung upon this same line of poles; and that having failed to perform this slight duty (which it seems from the record the appellant never did, but depended wholly upon the police and the good citizens of the city of St. Louis to perform that duty for it) he was not entitled

to a recovery, and that it was the duty of the trial court to have so instructed the jury; and that having failed to so do it now becomes the duty of this court to do that which the trial court erroneously refused to do.

With all due deference to the opinions and learning of my associates who entertain different views I am firmly and unalterably of the opinion that the evidence in this case does not show that the respondent was guilty of such contributory negligence as required the court to declare as a matter of law that he was not entitled to a recovery.

The importance of this case does not stop with the poor unfortunate who was so frightfully injured by the gross negligence of the appellant, but it cuts deep and to the very quick of the duty of those who handle this insidious and deadly fiend. And in passing, the fact should not be overlooked that the public has no access to the generating or distributing agencies of this highly useful servant, yet deadly when unharnessed; and for this reason no one is in a position to protect himself or herself against its lurking and deadly stroke, but must depend for their safety upon the intel-·ligence and the high degree of care the law has so wisely imposed upon those who are granted the privilege of handling the same and furnishing it to the public. For this reason all of the authorties agree that the degree of care required of such companies must never be reduced, lessened or lowered.

Returning to the question of contributory negligence: Can it be declared as a matter of law that because the respondent failed to see that the light wire was in contact with the iron handhold, he was guilty of such contributory negligence that he was not entitled to a recovery? I think not.

It should be borne in mind that the negligent act complained of on the part of respondent was one of omission and not of commission, which is never treated with the same gravity as the latter. He simply failed

to see a defective and dangerous condition in appellant's wires, which was the result of the negligent acts of commission on the part of appellant, the existence of which he was not required to anticipate or look for, except of course, in so far as it was his duty to look out for his own safety. And that brings us to the legal proposition; was that defect so apparent or obvious that the law will declare that a reasonably prudent person looking out for his own safety would have seen that dangerous condition. In this connection it should also be remembered that respondent had the legal right to presume and to act upon the presumption that the appellant had properly guarded its wires when it removed the old pole and inserted the new; also that it had properly insulated its wires, both of which the uncontradicted evidence shows it had not done.

The law should and always does, in considering the acts of men, give due weight to the facts and circumstances surrounding them and which naturally influence their conduct at the time; and under this rule the failure of respondent to discover the contact between the appellant's wire and the iron handhold on the pole, after thus having doubly assured him of his safety, should not be declared negligence as a matter of law. He had the right to rely upon the presumption that appellant had performed its duty in the regard mentioned, especially after having examined the cable-box he had ascertained therein that the Kinloch wires, the ones he was inspecting, were free from contact with all light and power wires. This again diverted respondent's attention from the light wires and lulled him into a sense of security from all danger from that source.

It is true two witnesses after the accident had occurred, while standing on the ground near the pole, saw the light wire was in contact with the iron handhold; but can it be said as a matter of law that because

they saw it, all other prudent persons walking by or climbing the pole would also have noticed the position of the wire? · It should be added that one of these had his attention previously called to the fact that the light wire or some power wire was out of condition, and that he was on the lookout for it when he discovered its contact with the iron handhold, while the respondent had no such warning of danger. The conduct of this witness, with such notice, should not constitute the rule by which the conduct of respondent should be judged when he had no notice whatever.

Again, this record does not disclose the position of these two witnesses when they observed the condition of the light wire and the iron handhold which was only a few inches from the pole. It cannot be said as a matter of law that the respondent occupied the same favorable position for observation that they did. A person standing on the south side of the pole looking for danger from the light wire, as one of these witnesses was, would be more likely to observe what they saw than another would, though equally prudent, standing on the other side of the pole, anticipating no danger, especially when there were so many wires strung thereon, distracting attention from the particular one in question.

This record also discloses that two other witnesses apparently as intelligent, prudent and as disinterested as the two previously mentioned, the first to reach the pole after the respondent received the shock, did not see or notice the contact between the light wire and the handhold which caused respondent's injury. One of them saw the burnt place on the pole just above the handhold, but did not notice the contact between the two. Can·it also be seriously contended that these two gentlemen were guilty of negligence as a matter of law for their failure to see the contact between the light wire and the iron handhold? I think not; for the simple reason that one person viewing an object from one

viewpoint will naturally see small parts thereof, which another from a different viewpoint never saw and could not have seen.

As previously stated, the respondent was under no legal or moral obligation to investigate the condition of appellant's wires; he had the right to assume that the appellant had performed its full duty in protecting him and the public from all danger incident to this valuable servant, when properly bridled, but a most powerful agency of destruction to life and property when not properly harnessed; that its wires and new poles placed in position by it were in a safe and proper position and condition; and that he would be in a state of safety in performing his duties as an employee to the Kinloch Company. Under these conditions I again ask the question, can it be declared as a matter of law that the respondent could not approach the pole mentioned, as a reasonably prudent person and ascend the same in the usual manner by usual means for the purpose of repairing the trouble he was sent out to find, which was on the north side of the pole without seeing or observing the contact of the light wire with the handhold on the south side of the pole? The answer must be, yes. Out of the five witnesses including the respondent, who examined the situation just after the injury occurred, but one of them without warning noticed the contact between the wire and handhold. That being true why should the law declare that he was the only reasonable, prudent person among the five?

Laws are made for the government of the people as they actually exist and not solely for the paragon of perfection in any line of conduct. That may be an ideal state to work to, but all such laws would afford but little protection to the ordinary man or woman now living and would be of no use to the paragon, for the simple reason his conduct would need no legal control.

It goes without saying that the respondent did not know that the light wire was resting upon the handhold. He so testified and he is uncontradicted. Furthermore, common sense proclaims in no uncertain terms that he would not have taken hold of the handhold had he known of the contact between it and the wire. The instinct of self-preservation would not have permitted him to have subjected himself to the horrible danger he encountered had he known of the contact.

I know of no law that required respondent to walk around the pole and examine it and the connections of the various wires therewith before ascending it, especially when he had no intimation of the negligence previously mentioned. The law only charges him with what he saw or by the exercise of ordinary care could have seen, at the time and under the circumstances.

The evidence is uncontradicted that the wire which injured respondent was insulated and that he had observed that fact before climbing the pole, and having had no ground to suspect that the insulation was insufficient for the purpose for which it was being used (namely, to protect the employees of the city and those of the various companies using the poles and making repairs just as respondent was doing when hurt) or that the wire was in contact with the handhold, it seems to me that it would be a rather harsh rule which would declare his conduct in ascending the pole looking for trouble on the Kinloch wires was negligence *per se,* simply because he did not observe the contact of the light wire with the handhold, which was on the opposite side of the pole from him, and within eight or ten inches of it.

That the evidence made out a case of contributory negligence for the jury I have no doubt, but to say that his conduct was negligence as a matter of law, I deny; and no authority has been cited nor can be found so holding.

In treating of this very question, 29 Cyc. 630-631 states the law in this language: ''Whenever it is necessary to determine what a man of ordinary care and prudence would be likely to do in the emergency proven, involving as it generally does more or less of conjecture, it can only be settled by a jury.''

Frantz v. Citizens Electric Company, 231 Pa. St. 589, decided by the Supreme Court of Pennsylvania May 11, 1911, is in point. The court said:

''We are asked to say that the learned court below committed error in not declaring as a matter of law that the deceased husband was guilty of contributory negligence. At the trial the questions of negligence and of contributory negligence were submitted to the jury in a charge fair to both parties and free from just criticism by either. No complaint is made as to the manner in which the questions were submitted, but it is argued with force and ability that the decedent was so clearly guilty of contributory negligence that the duty rested on the trial judge to so declare as a matter of law.''

The court then proceeds to state the ground upon which that contention was based, saying:

''This position is predicated upon the theory that it was the duty of the lineman to look up as he ascended the pole, and, if he had done so, he would have seen the dangerous wire at the point where the insulation had worn off, and if he had seen the uninsulated wire, or could have seen it by the exercise of reasonable care, it was his duty to avoid such an obvious danger. The difficulty with this position is that there is no imperative rule requiring a person climbing a telephone pole to constantly look up, and the testimony of all the witnesses in the case at bar, familiar with pole climbing, is that the decedent climbed the pole in the usual and proper manner. Under these circumstances it would be most arbitrary for the court to say as a matter of law that the lineman, who met his death in the

performance of his duties, did not climb the pole in a proper manner, when all the witnesses with experience in this kind of work testified he did. We agree it is the duty of an employee to use due care, so as to avoid open and obvious dangers. A servant cannot take his chances by recklessly and heedlessly running into danger, and then hold the master anwerable in damages for injuries resulting from his own folly. But that is not this case. After a careful examination of this record, we cannot say that the decedent recklessly and heedlessly came in contact with the defective wire which caused his death. We start with the presumption that the decedent did his duty, but it is argued that this presumption is overcome by the witness who saw him climb the pole. This only means that he did not look up after he started to climb, and the expert poleclimbers testified that it was necessary for him to watch his feet as he ascended because of the condition of the pole. He was an employee of the telephone company, and not of the appellant company. There is nothing in the evidence to show that he had any knowledge of the fact that the electric high-tension wires were attached to the telephone pole.''

To the same effect is the case decided by the Springfield Court of Appeals, Trout v. Gaslight Co., 151 Mo. App. 227, 229 and 231. It was argued in that case, as here, that the danger was obvious and that as plaintiff had climbed the pole before, he could have seen the dangerous condition if he had looked, but the court refused to hold as a matter of law that he was guilty of contributory negligence.

The Supreme Court of Minnesota in Musolf v. Duluth Edison Electric Co., 108 Minn. 369, 1. c. 374, said: ''The jury found that the death of the deceased was not caused by his own negligence. No considerations have appeared in the record which would justify us in holding that as a matter of law deceased knew of the defective insulation of the wires. He had the right

to rely upon the performance of its duty by defendant. He was not bound to anticipate defendant's negligence.''

This Court in Von Trebra v. Gaslight Co., 209 Mo. l. c. 662, used this language: ''While it is true there is evidence in this record which might have warranted the jury in finding he was guilty of contributory negligence, yet they did not do so. That was an issue which could be only determined by the jury. It was properly submitted to them, and they found against appellant, which is conclusive upon this court.''

The same principle was involved in Buesching v. St. Louis Gaslight Co., 73 Mo. l. c. 230. The court said: ''Taking it for granted then that Buesching fell into the opening, or what is tantamount thereto, that there is testimony from which that fact could be found, the next question is, is there evidence on which a jury should be permitted to find that at the time of his fall the deceased was in the exercise of ordinary care? The argument of defendants' counsel is, that if the deceased saw this entrance, he was negligent in not avoiding it. If he did not see it, he was negligent in not looking, as it was in plain view and well known to him, and had been for years before.''

The court further along in the opinion, l. c. 232, said:

''The argument for the defendants, then, with the element of previous knowledge eliminated, stands thus: As the opening was not concealed, but was obvious to the sight, the deceased was guilty of negligence if he did not see it, and if he did see it, he was guilty of negligence in not avoiding it. These propositions are stated as abstract propositions, which must, if true, obtain in all cases, and not in this case only, for the circumstances under which Buesching failed to see the cellar way, or seeing it, failed to avoid it, are not shown by the testimony. These propositions, then, if they are true, and mean anything as applied to this

case, mean that Buesching should, no matter what the circumstances surrounding him at the time, have seen the hole into which he fell, and seeing it, should, no matter how great the difficulty of so doing, have avoided it. If such be the law, it is quite plain that there never could be a recovery for an injury occasioned by an obvious defect in a highway. But such is not the law. The law is that the deceased was guilty of negligence if he did not see it, provided he would have seen it by exercising ordinary care.''

Crawford v. Stockyards Co., 215 Mo. 394, was a suit for personal injuries suffered by the plaintiff while on some cattle cars that came in contact with open gates extending out over the platform at the stockyards. It was urged that a recovery could not be had because of plaintiff's contributory negligence, which consisted in the charge that he either saw the open gate before it struck him, or could have seen it by the exercise of ordinary care. This court refused to declare that as a matter of law there could be no recovery, but held that the question of contributory negligence was for the jury. The court said (l. c. 413):

''The evidence shows that if the gates had been open when he was coming down the stairway he would have seen them if he had looked, and it also shows that he did not look, but that on the contrary he came down the stairway with his mind on the cattle, leaning over the railing with his face turned south. If the plaintiff saw the gates open he was guilty of negligence in not taking care to avoid coming into collision with them; but the testimony is that he did not see them. Was he negligent because he did not look in that direction as he came down the stairway? As a general rule a man is not required to look for danger when he has no cause to anticipate danger or when danger does not exist except it be caused by the negligence of another. [Citing authorities.] That is the general rule, and whilst

there may be some exceptions, yet there is nothing in this case to take it out of the general rule. There is nothing in the evidence to indicate that plaintiff had any reason to anticipate that these gates might be open.''

This rule was also applied in Russell v. City of Columbia, 74 Mo. 480. See also Langan v. Railroad, 72 Mo. 392.

The record in this case presents a much stronger case for the respondent than do any of the cases cited. Here the respondent was where he had the right to be; he examined the cable-box and found the Kinloch wires, the ones he was inspecting, were free from contact with any high voltage wires; he observed the poles and wires of all the companies in a general way, but noticed no defect of any kind; he did not know of the contact between the appellant's wire and the handhold; he had no notice of appellant's negligence in failing to secure its wires to the cross-arms on the new pole; he had no intimation of danger lurking about him and had no special occasion for being on the lookout for same; and that appellant's wires were not properly insulated for the purpose they were being used, was known by it but unknown to the respondent.

These facts are practically undisputed, but whether they are or not is wholly immaterial, because the jury found them to be true upon an abundance of evidence which for the purpose of the demurrer in this case is the same as though they were undisputed.

So under the authorities previously cited, as well as those to be presently mentioned, I am fully satisfied that the evidence made a prima-facie case for the jury, and that the trial court properly refused the demurrer to the evidence and the peremptory instruction asked by counsel for appellant. [See Geismann v. Missouri-Edison Electric Co., 173 Mo. 654; Ryan v. Transit Co., 190 Mo. 621; Young v. Waters-Pierce Oil Co., 185 Mo. 634; Downs v. Telephone Co., 161 Mo. App. 274; Camp-

bell v. United Railways, 243 Mo. 141; Kile v. Light & Power Co., 149 Mo. App. 354; Braun v. Buffalo General Electric Co., 34 L. R. A. (N. S.) 1089.]

II.   The next assignment presented for a reversal of the judgment of the circuit court is stated by counsel for appellant in the following language:

"Defendant was not bound to foresee that an experienced lineman and 'trouble' man would use this new barren pole, not for the purpose of stringing or maintaining or repairing wires upon it, not for the use of any space reserved on it for his employer, but purely a matter of convenience for the purpose of reaching away from it to untangle some of his company's nearby wires."   I have not quoted the last clause of this assignment for the reason that it goes to the question of contributory negligence, which was fully considered in paragraph one of this opinion, and no good purpose would or could flow from a re-statement of the proposition or a re-discussion of the same.

This contention of counsel for appellant shows how completely they misapprehend the purposes for which the original poles were erected by the city; the rights regarding them by the respective companies using them, as well as their rights to the new or substituted poles in consequence of those rights, and the relative duties they owed each other and their employees on that account.

As previously ruled each and all of the parties using the poles had equal rights to the use thereof for all of the purposes mentioned in their respective licenses, which of course included the right to place in position cross-arms and to string wires thereon; and to use the poles for the purpose of repairing the cross-arms and wires and for all other purposes that were or might become necessary to keep them in proper operation.   These same rights and duties attached to the new poles; and when the appellant under

its license removed an old pole and inserted a new one, the same rights and duties of the respective parties attached to them that related to the old ones.

With these observations in mind it should be remembered that not only was appellant's wire detached from the old pole, and left dangling in the air in the vicinity of the new pole, but those of the Kinloch and the Western Union were likewise detached and left unsupported; and while there is no direct evidence bearing upon the question, yet it is clearly inferable from all the facts and circumstances detailed in evidence that the "trouble" with the Kinloch wires, the ones respondent was sent out to locate and remedy, was caused by the same carelessness and negligence that caused the appellant's wires to swing to and fro in the strong wind the night before and become entangled with the iron handhold. In other words, I am fully satisfied that the same carelessness of the appellant that caused its wire to sag and rest upon the iron handhold of the new pole, also caused the "trouble" with the Kinloch wires that respondent was sent out to locate and repair, namely, the removal of the old pole and the appellant's negligence in not connecting its and the wires of the city and the other companies mentioned, to the new pole inserted by it. Is it any wonder that those twenty-five or more wires left swinging and dangling on a stormy night should become entangled with one another and come in contact with the pole erected in their midst without cross-arms, stays or barriers of any kind to hold wires in place? I think not; and to hold that under the evidence preserved in this record the jury was not warranted in so finding, which evidently they did, would be to accuse them of being deficient in that intellectual quality which enables men to draw correct conclusions from known causes. They found and correctly so, that this whole trouble to both the wires of the appellant and those of the Kinloch, as well as the injury of the respondent, was caused

by the inexcusable and gross negligence of the appellant. This contention of appellant is untenable, and should be and is overruled.

III. The third error assigned for a reversal is thus stated by counsel for appellant:

"(a)  It bases plaintiff's right to use the new pole for the purpose of mere convenience, for which he used it, on the right of his company to use space on the old poles for other purposes; that is, for stringing and maintaining its wires.

"(b)  It omits all reference to an essential issue in the case. Plaintiff charged specific negligence, to-wit, that defendant's wire, in a dangerous condition, was allowed to be and remain on the iron step from the date of the erection of the pole to July 12, 1907, the day of the accident. The instruction permits a verdict for the plaintiff if the jury should find merely that the wire was in contact with the step at the moment of the accident.

"(c)  The instruction authorized a verdict for plaintiff if the jury believed that the insulation on defendant's wire was inadequate and insufficient for any cause; whereas the specific charge of negligence in the petition is that the wire was dangerous because it had been by long use, neglect and by the force of the wind and weather, permitted to become decayed, worn and disintegrated, so as to expose said deadly current in said wire and permit the same to escape to the said iron step or handhold in said pole, etc."

There is not an element of this objection which has not been fully considered and determined by us in paragraphs one and two of this opinion when passing upon the demurrer to the respondent's evidence and the peremptory instruction asked by counsel for appellant telling the jury to find for the latter.

If the conclusions there announced were correctly drawn, then the objections here made to this instruc-

tion are without merit. But in passing I wish to reiterate in this connection that while the petition charged that the insulation of the light wires was old and decayed and on that account was insufficient to confine the current of electricity to the wires, and that by reason thereof the same escaped therefrom and injured the respondent, and that while there was practically no evidence introduced tending to show that the insulation was old or decayed, yet all the evidence introduced by both parties shows conclusively that the insulation was wholly insufficient for the purposes for which it was being used, which was the ultimate fact in issue, regardless of the cause. The appellant not only conceded its insufficiency, but its superintendent testified that there was no insulation known by which such wires could be perfectly insulated. So as previously stated, it is wholly immaterial from what source the insufficiency arose, under the state of the pleading, provided appellant was not misled thereby. The question presented by the pleadings was, was the insulation sufficient to protect the respondent from injury? The respondent charged that it was not and the appellant answered that it was. The cause of the insufficiency was wholly immaterial since the evidence for both parties conclusively shows that fact was true, and that of appellant went one step further and tended to show that no such insulation was known or could be manufactured.

There is no merit in any of these objections and they are disallowed.

IV. It is next insisted by counsel for appellant that the trial court erred in refusing instruction numbered three asked by it, and in giving it in a modified form. The instruction as asked declared the law to be that the appellant was engaged in a highly dangerous and extra-hazardous business, and that on that account the law imposed upon it the duty to exercise a very

high degree of care to make its wires, etc., reasonably safe to those who, in the performance of their duties, might be brought in contact with them.

The theory of counsel is, that because the law imposed this high degree of care upon the appellant it should also impose a correspondingly high degree of care upon the respondent to look out for his own safety when working about or being in the vicinity of its wires.

There is absolutely no merit in this insistence. It was the appellant that was engaged in the extra-hazardous business, and not the respondent. The latter had nothing more to do with the former's business than a member of this court has; he was not even an employee of the appellant.

It might just as well be said that because a common carrier of passengers is required to exercise this high degree of care therefore the passenger must also exercise the same high degree of care. There is no reason or sound policy involved in such a contention. The theory of the law is that when a person engages in any hazardous business and especially one for private gain, he must use that degree of care which is commensurate with the high degree of duty the law imposes upon him to protect the public from the great dangers incident to that business; and not that the public should exercise that care for the benefit of the person so engaged. The public has no knowledge or control of a business of that character and but few individuals have any knowledge of the dangers incident thereto; and no individual has any power or authority to control the business or to regulate or lessen the degree of danger incident to its operation. Under those facts it would be highly unjust and oppressive to all, should the law impose that high degree of care upon the public and by that indirect method relieve or lessen the duty of

260 Mo.—7

the appellant and all other persons and companies similarly situated which they owe to the public.

Every person in every walk of life must exercise ordinary care for his own safety and every person and corporation engaged in an extra-hazardous and dangerous business must exercise a correspondingly high degree of care to protect the public from all dangers incident thereto. This is elementary and is the recognized law the world over.

The trial court modified said instruction numbered three and told the jury that respondent was required to exercise ordinary care for his own safety while performing his duties for the Kinloch Company at the time he was injured.

We are, therefore, clearly of the opinion that the instruction as asked was erroneous and that the court properly modified and gave the same in the modified form.

There is no merit in this insistence.

V. The correctness of the instruction on the measure of damages is challenged for the reason thus stated:

"The court erred in giving plaintiff's instruction number 11 on the measure of damage.

"The petition alleged plaintiff's earning capacity at one hundred dollars ($100) per month, and averred that he had lost and would continue to lose this amount monthly. The instruction in nowise limited the jury in any award they might choose to make plaintiff on this account for such loss."

There is no merit in this contention. The petition somewhat minutely stated the various elements of damages sustained, but did not undertake to state the amount of each, but after this enumeration the petition stated generally that respondent was damaged in the sum of $35,000, and prayed judgment therefor.

Good pleading requires the injured party to state his earning capacity, etc., but the law does not require the pleader to ask a separate finding on each element of the damage; and there is no more reason for requiring a separate assessment on the loss of earnings than there is for a separate assessment upon each and all of the other elements stated.

This contention is wholly without merit.

VI.  It is lastly insisted that the verdict is excessive.

The verdict was for $22,500, but the court required the appellant to enter a *remittitur* of $4500, reducing the verdict to $18,000, and then rendered judgment thereon.

There is no question but what this is a large judgment, much above the average; but it should be borne in mind the injuries sustained in this case are also far above the average injuries involved in the ordinary lawsuit.

This is not a case where the proverbial invisible weak back, stiff joints, loss of manhood, injury to some vital organ, etc., was presented to a jury for determination; but it is a case where the terrific force of 2300 volts of electricity poured through the body of respondent for several minutes and left its visible and indubitable evidence of the frightful effect upon respondent.  Both hands were practically burned off, besides he received other severe injuries and the physical pain and mental anguish suffered by him is beyond description; and the suffering he will have to endure in the future is equally apparent.

Respondent was twenty-odd years of age, earning about $100 per month prior to his injury and since then about $35 to $40; and his life expectancy was thirty-five and one-third years.  The net loss in his wages up to this date has been about $4000, and should he live his allotted time, thirty-five years, his loss in

that regard will have amounted to more than $20,000, a sum in excess of the amount of the judgment. Should we add to this his disfigurement, physical pain and mental anguish suffered and to be suffered by him it would be much larger. Since, however, he has expressed a willingness to accept $18,000, it seems to me that the appellant has no substantial reason to complain along that line.

I know of but two cases where the injuries received were more frightful than were those sustained by the respondent in this case. Those cases are Clark v. Railroad, 234 Mo. 396, and Corby v. Telephone Co., 231 Mo. 417. While the injuries in those cases were greater than those received by respondent, yet the judgments therein were proportionately larger.

For these reasons I believe that the judgment of the circuit should be affirmed. *Lamm, C. J., Walker, J.,* and *Brown, J.,* concur; *Brown, J.,* in result, and *Lamm, C. J.,* in a separate opinion filed, in which *Woodson, Brown* and *Walker, JJ.,* concur; *Graves, J.,* dissents, in a separate opinion in which *Faris, J.,* concurs; *Bond, J.,* dissents in separate opinion.

## CONCURRING OPINION.

LAMM, C. J.—My vote is to concur, because: The following propositions gather head and must be admitted on this record: First, defendant was negligent; second, plaintiff had the right, nay, was invited to climb the pole; third, (stripped of speculative embroidery) on last analysis the turning question is: Was plaintiff guilty of contributory negligence *as a matter of law?*

The rule is: If there can be no two ways about it among reasonable persons of average intelligence but that he was, then the question was for the court; but if there can be different views entertained by rea-

sonable persons of average intelligence, then the question was for the jury.

Now, plaintiff had two points of view—two places to look and see—one *on the ground,* before starting to climb—one *on the pole* while climbing. The question, then, splits in twain and becomes two, to-wit:

*First,* was plaintiff while on the ground guilty of contributory negligence as a matter of law, in not using ordinary care to see (or in not seeing) the contact of the sagging high-voltage wire with the iron spike he must use as a handhold or step toward the top of a pole, say, forty feet high?

*Second,* Or was he so guilty in not seeing such contact while climbing the pole?

As to the first, to say that ordinary care (as a matter of law) requires a man on the ground to see the contact of a high-voltage wire with an iron spike at the top of a pole forty feet high, will not do. That would be extraordinary, not ordinary, care. Many men might have many minds on whether he could or should. Hence, the question was for the jury on that phase of it. Especially so, as he had no warning of trouble in general or of trouble of that kind, but was warned and had found the trouble he was looking for, to-wit, two harmless wires entangled or crossed.

As to the second, the situation is even more favorable to plaintiff. No court should say, I think, that a man climbing a pole and using ordinary care is bound (as a matter of law) to see the contact of that wire with a spike *on the other side of the pole.* To say so means that a climbing man must look *up the pole, down the pole* and *around the pole* at every instant of time. Now a man, being a sitter or walker, is not a natural pole-climber and at ease in climbing, like a squirrel or monkey. *Contra,* a man climbing a pole has troubles incident to the fact that he belongs to the *genus homo sapiens* and his native home is on the ground, *i. e.,* he has troubles of his own to look out for. Anyone who

ever climbed a tree knows that his feet, legs, arms, hands, body, all demand and divide his attention. So, the danger of falling not only makes some fear natural, but makes a call on his mind. To say plaintiff must look around the pole every time he reaches round it to grasp a spike on the other side (to see if lightning won't strike him when he touches it) is to demand an unusual thing—an extraordinary care, it seems to me. Naturally, then, my conclusion is, it was for the jury to speak the final word. The jury did, and I rest content. *Woodson, Brown* and *Walker, JJ.*, concur in these views.

## DISSENTING OPINION.

GRAVES, J.—I cannot concur with my learned brother in the affirmance of this judgment. I think the plaintiff's own negligence bars his action. His very duties (those of a "trouble" man among wires) required of him alertness. He was advised of the situation. He knew that there had been a windstorm and wires were apt to be misplaced. In fact this was one of the "troubles" in the line of his work. He knew that the line of poles was occupied by more than one company. He knew that wires of the defendant carried a deadly current. He knew that by wind or otherwise such wires might become displaced. When he reached this pole in question he knew or might have known by the exercise of reasonable care that the wires had not been strung thereon, although the pole stood up in the midst of them. He knew that there were iron handholds or steps thereon, because he was using them. He knew that the deadly ladened wire of the defendant ran by that pole and that it had not been fixed to a cross-arm so as to keep it in place. His experience taught him that if a wire of high voltage was in contact with the iron steps, and his hand was placed upon the iron step, he might be burned. The steps and the wires were

there in plain open view.  To look was to see them.
The plain physical facts cannot be wiped out by evasive
testimony.  [Kelsay v. Mo. Pac. Ry. Co., 129 Mo. l c.
376.]

Had plaintiff looked as he proceeded up this pole
this case would not be here, he would not have been
injured.  When the evidence from all sides, as here,
discloses a situation of physical facts, we must meas-
ure care or want of care by those facts.  We cannot
blind our eyes to them and admeasure rights.  The con-
dition of this pole was in plain view.  As plaintiff went
up the pole had he looked at each step before touch-
ing it, the trouble would have been averted.  The pole
stood among these wires and this he knew.  The steps
were there and the slightest care upon his part as he
approached the wires in his ascent would have discov-
ered the contact of the wire and the iron step.  Under
the admitted and undisputed facts the negligence of
the plaintiff bars his action, and the trial court should
have so said.  The judgment should be simply reversed.
*Faris, J.,* concurs in these views.

## DISSENTING OPINION.

BOND, J.—The negligence alleged in the petition
was, that the injury occasioned to plaintiff by climbing
a bare pole containing only spikes for footholds, which
had been erected by defendant preparatory to its fu-
ture use for supporting its own wires and those of
other companies when cross arms should have been
attached thereto, was caused by the fact that defend-
ant negligently permitted its defective insulated wire
to remain in that condition from the time the pole was
erected until the twelfth day of July, whereby plain-
tiff, who was an employee of another company and
was ascending the pole in order to reach and release
some of the wires which had been crossed by other
wires, and in so doing, and while reaching for the

crossed wire with one hand and feeling around the pole with his knee to keep his balance, he placed his foot on one of the spikes on which the defendant's said wire was then resting, and received the shock which caused the injuries sued for.

There was not a particle of proof to sustain the allegation of defective insulation of the wires of the defendant prior to the accident. The pole had been erected for about a month and was not, as yet, supplied with crossarms for the support of the wires which were to be placed thereon when the old pole, some distance off, should be removed.

There is no evidence whatever of any right given to the other company, of which plaintiff was the employee, to use the pole in question until it should be equipped with cross-arms in order to support the wires it was intended to bear, nor that defendant could reasonably foresee the incidents culminating in the injury to plaintiff, who at the time of the accident was a "trouble" man sent out to discover and remedy some mishap to the lines of the Kinloch Company, which was his employer. This utter dearth of evidence to show any negligence on the part of defendant is the only reason why I am constrained in the present state of the law to dissent to the opinion adopted by the majority of the court affirming a judgment obtained by plaintiff. But I am not willing to concede that the right to recover for an injury suffered in hazardous industry, should any longer be predicable only upon proof of negligence on the part of the owner. I think that stage in the evolution of the law has now been passed, and that the administration of justice should no longer be obstructed by the outworn legal concept, which refuses all compensation for injuries caused by work necessary to social betterment except upon proof of causative negligence on the part of the employer.

The multitude and mischief of cases like the present demonstrate, in my opinion, the imperative need

in our positive law of an enactment embodying the principle of workingmen's compensation. [3 Bailey, Per. Inj. (2 Ed.), secs. 858-9.] The economic and social reasons demanding such a law are universal among the civilized nations of the world where industrialism has reached a development and expansion undreamed of in the past. The moral life, comfort and well-being of humanity today, not to mention its luxuries, require the employment for utilitarian purposes of the great bulk of the human race. Society demands the product of the labor of the men so employed. This imposes a correlative duty upon it, to provide compensation for injuries caused by the perilous employment it exacts of them as the wage of life and sustenance, and furnishes the moral and economic reason for charging such employments with the payment of indemnity for injuries sustained by the men engaged in them.

The duty to see this done rests upon the law-making bodies of the State and Nation. The failure to exert that power is dereliction of sovereign duty on the part of the State which, in its capacity as the representative of organized society, is entrusted with governmental power of regulation commensurate with the purpose for which it exists. It is the absolute duty of the State, in virtue of its inherent power of police and of internal regulation of the affairs of the people, to cause its statutory or positive law to walk hand in hand with the principles of social justice as they are evolved by the growth and progress of civilized life. Such enactments can be made so as not to violate any restriction imposed upon the law-making power by the State or Federal Constitution. Twenty-two States of the Union, and many of the most enlightened nations of the world, have incorporated the feature of Workingmen's Compensation as part and parcel of their municipal law. This should be universally done in the States of this Union, whose vast industrialism, so far

out-stepping that of any other Nation, creates a correspondingly greater reason for such legislation.

There need be no apprehension of failure on the part of the courts to enforce these salutary laws if they are framed with justice, fairness and wisdom, and are properly guarded against greater injuries to others than the mischief they design to remedy. While the decisions of the courts represent the fixed forms of concentrated public opinion, yet they must adapt themselves to any essential change of the conditions upon which they rest, and they do meet, and must reflect the stable forms of economic and social science, acquired in the progress of public thought. [Borgnis v. Falk Co., 147 Wis. 327; In re Opinion of Judges, 209 Mass. 607; Employers' Liability Cases, 223 U. S. 1.]

While the Workingmen's Compensation Act was declared unconstitutional by the Courts of Appeals of New York, that conclusion was reached under the rigid rules applicable to the state of the law as then expounded in the rulings of the courts. But social purpose then moving, and never resting, has passed beyond the stage of public opinion upon which the ruling of that court was based, and another Legislature has enacted a new law for the relief of workingmen. It does not follow that the courts would now feel themselves bound to apply to this new act, which crystalizes modern thought, the rulings which were applicable to the simpler and earlier social conditions from which they were deduced.

In the State of Washington, the Legislature has enacted a just and wise scheme of providing for its people whose living depends upon the development of its industrialism. In a general way that scheme is a great advance beyond the crude provisions contained in the English Act of 1897. The Washington statute has ramifications covering every branch of industry. Its practical enforcement is lodged in the hands of an administrative board, its workings have been fair and

just to the employer as well as the employee, and have been sanctioned by the Supreme Court of that State. [State ex rel. v. Clausen, 65 Wash. 156.] Its general features have been enacted in ten other States of the Middle West, including Illinois, Wisconsin, Michigan and others.

The State of Missouri should make similar provisions for compensation for workingmen engaged in dangerous employments within its borders. It can safely do so under the power entrusted to it by the Constitution and for the object and purpose proclaimed in its Bill of Rights. [Constitution, art. 2, sec. 4.] By taking this step it would accomplish a great act of duty and social justice, of which it has been said by the President of the United States in his recent message to Congress, "Social justice comes first. Law is the machinery for its realization and is vital only as it expresses and embodies it." [Message to Congress, Dec. 2, 1913.] No publicist has stated more clearly, completely and concretely, nor with more pith and power, the basic principles and true end of all laws devised for the well-being of organized society. When that ideal is realized society will pay the toll of injuries necessarily inflicted to accomplish its needs, for each industry will add the expense of its liability to the reasonable profit earned in its workings and thus the burden will be shifted upon the community where it should rightfully rest. The particular employer cannot then complain that he has been mulcted for damages which were not caused by his negligence, for not he, but the public, will pay the price of the comforts and well being accruing to it from the conduct of the needed industry.

While I dissent to the opinion, in this case because, in the absence of any proof of negligence on its part, no liability could be incurred by defendant under the law of the land, I have felt it my duty in so doing to point out to the people of this State and their Legis-

lature, the duty resting upon them to amend that law so that the dangerous occupation demanded by society shall be charged with compensation for injuries caused by them totally irrespective of their negligent operation.

## ON MOTION FOR A REHEARING.

WOODSON, J.—The principal reason assigned by counsel for a rehearing is, that the judge who wrote the majority opinion in the case misconceived the evidence regarding the removal of an old pole and the substitution of the new one mentioned in the evidence, as authorized by the permits, set out in the statement of the case.

It is contended in this motion that the record does not show that an old pole was removed or that a new one was inserted instead thereof, but that the new pole was erected at a different place, some thirty feet from where any of the old poles had then or formerly stood, and that none of the wires of the various parties mentioned had been attached to the new pole.

Conceding for the sake of the argument *only*, that said contention is true, which as a matter of fact I do not believe from this record to be true, yet, the result must be the same as announced in the opinion heretofore handed down, for the reasons; first, that if the new pole erected was not placed in the place of the old one authorized to be removed by the permits mentioned, then the new pole which caused the injury was a public nuisance (Cartwright v. Liberty Telephone Co., 205 Mo. 126), which as a matter of law would render the defendant liable for all injuries which would naturally flow therefrom, regardless of the question of negligence on its part. The law will not permit a party to say that it is true he constructed and maintained a public nuisance which injured another and he is not liable in damages therefor, because the nuisance was

constructed and maintained *even* with the highest degree of care and caution.

In such cases the question of negligence does not enter into the merits of the case, for the simple reason that the establishment and maintenance of a public nuisance is a greater breach of the law than any act of negligence. If that was not true then any person could create or maintain as many public nuisances as he deemed proper, and thereby injure others every day, yet escape all liability by saying that he used the highest degree, or even due care in constructing and maintaining them. In other words, the construction and maintenance of public nuisances are within and of themselves acts of the most grievous violation of the law, much more so than any ordinary act of negligence. The author of the former is not only liable for all damages that naturally flow therefrom, but he is also subject in many cases to a fine and imprisonment therefor; while in but few cases of negligence is one liable criminally therefor.

This seems to be conceded by all of the authorities without exception, in so far as I can find. Counsel for relator in the case of State ex rel. Excelsior Powder Manufacturing Co. v. Ellison, *post,* p. 585, the opinion in which was handed down by Court in Banc on July 14, 1914, seems to concede this to be the law and cites no authority to the contrary, but attempts to escape liability upon the ground that a railway is not a public highway within the meaning of the ordinary public road or highway of the counties and State.

I have made quite an extensive examination of this question, and I have been unable to find a single authority to the contrary; and upon the contrary, I have been unable to find a single case of this character where the law requires the plaintiff to go further than to plead and prove that the injury was caused by a public nuisance. I do not mean by this statement to be understood to say that there are not many cases wherein

both negligence and the nuisance were charged and proven, but what I do mean to say is, that I know of no case where the question has been raised which holds that negligence must be charged and proven in addition to the fact that a public nuisance caused the injury, and I dare say none such exists.

And upon principle and justice no person should be permitted to maintain a public nuisance and then say that he is not liable for the injuries which naturally flow therefrom. This principle of law is so well and universally recognized it would be a useless waste of time and labor to cite authorities in support thereof.

The second reason why the motion for a rehearing should be denied is: That if the new pole was not erected in lieu of an old one in pursuance to the permits issued by the city to the defendants, how could the plaintiff know that fact? There is no direct evidence bearing upon that point; but suppose there was, still the new pole was intended to serve the purposes of the old one, and was subjected to the same uses and burdens that it was; and the plaintiff had the same right to use the new that he had to use the old. This is self-evident.

A third ground assigned for a rehearing, which I take to be more facetious than serious, is couched in two questions which will be presently quoted, regarding what we stated in relation to the insulation of wires.

The questions referred to are as follows:

"Did the court stop to think that defendant could not put rubber gloves on its wires? That there is no such insulation for wires, because in the wind and weather rubber would not last at all and therefore no such insulated wire can be bought?

Answering those questions—not in the spirit in which they were asked, but in a judicial spirit—I will for myself state, that I did not think of the former question, nor do I agree to the result indicated by the two questions propounded.

Hill v. Union E. L. & P. Co.

We proceeded upon the theory that if a hand could be perfectly insulated by rubber gloves, which require great skill and considerable cost to manufacture, then by parity of reasoning a single wire could be insulated much easier—as much so as one finger of a man could be insulated by one rubber finger of the glove, and with no more than a tithe of the cost proportionately.

And as to the wear suggested by the second question I naturally supposed a wire insulated and hanging upon the cross-arms of the poles, though exposed to the wind and weather, would certainly last as long as a rubber glove which is equally exposed to wind and weather and also constantly coming in violent contact with the wires, poles, cross-arms, tools and various other instrumentalities used by the "trouble" man in adjusting and making the thousand and one repairs that are necessary to be made upon these great electrical systems of wire overhanging our cities. This is upon the same principle that a pavement will outlast a boot or a shoe, and be not as costly in proportion.

If this is not sound reasoning then my common knowledge, experience and general observation are not worth the paper these words are written upon.

But be this true or false, I am still of the opinion that the grievous injuries sustained by the plaintiff were caused by the grossest character of negligence on the part of the defendant; and that the defendant had a fair and impartial trial; and for that reason the motion for a rehearing should be overruled; and it is so ordered. All concur except *Graves, Bond* and *Faris, JJ.,* who dissent.